IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| FAULCONER PRODUCTIONS MUSIC CORPORATION | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:03cv400 |
| FUNIMATION PRODUCTIONS, INC.; FUNIMATION PRODUCTIONS, LTD.; FUNIMATION PRODUCTIONS MANAGEMENT, LLC; THE FUNIMATION MANAGEMENT COMPANY, LLC; GEN FUKUNAGA; DANIEL COCANOUGHER; and STEPHANIE GIOTES | § § § § § § § § § | |
| Defendants. | § § | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Faulconer Productions Music Corporation files this, its Second Amended Complaint, against Funimation Productions, Inc., Funimation Productions, LTD., Funimation Productions Management, LLC, The Funimation Management Company, LLC (collectively referred to as "Funimation"), Gen Fukunaga, Daniel Cocanougher, and Stephanie Giotes (all defendants are collectively referred to as "Defendants") and in support thereof, would show the Court the following:

# I.

## PARTIES

1.1     Plaintiff, Faulconer Productions Music Corporation, is a Texas corporation doing business in Collin County, Texas.

1.2     Defendant, Funimation Productions, Inc., is a Texas corporation with its principal place of business at 6851 NE Loop 820, Suite 247, Fort Worth, Texas 76180, and is duly authorized to do business in Texas.  Defendant has appeared in this action.

1.3     Defendant, Funimation Productions, LTD, is a Texas Limited Partnership with its principal place of business at 6851 NE Loop 820, Suite 247, Fort Worth, Texas 76180, and is duly authorized to do business in Texas.  Defendant has appeared in this action.

1.4     Defendant, Funimation Productions Management, LLC, is a Texas Limited Liability Company with its principal place of business at 6851 NE Loop 820, Suite 247, Fort Worth, Texas 76180, and is duly authorized to do business in Texas.  Defendant has appeared in this action.

1.5     Defendant, The Funimation Management Company, LLC, is a Texas Limited Liability Company with its principal place of business at 6851 NE Loop 820, Suite 247, Fort Worth, Texas 76180, and is duly authorized to do business in Texas.  Defendant has appeared in this action.

1.6     Defendant, Gen Fukunaga, is an individual who resides at 2048 Coventry Court, Roanoke, Texas 76262-9005.  Defendant has appeared in this action.

1.7     Defendant, Daniel Cocanougher, is an individual who resides at 216 South Jackson Avenue, Justin, Texas 76247-9574.  Defendant has appeared in this action.

1.8     Defendant, Stephanie Giotes, is an individual who resides at 4916 Arborgate Drive, Arlington, Texas 76017.  Defendant has appeared in this action.

## II.

## JURISDICTION AND VENUE

2.1     This is an action to recover money damages and for injunctive and other equitable

relief arising under the copyright laws of the United States and under contract and tort law.  The

Court has original jurisdiction over the subject matter pursuant to 17 U.S.C. § 501 and 28 U.S.C.

§§ 1331 and 1338 (a) and (b).  The Court has supplemental jurisdiction to hear Faulconer's state

law claims under 28 U.S.C. § 1367 because the claims arise from the same operative facts as

Faulconer's federal claims and form part of the same case and controversy under Article 3 of the

United States Constitution.

2.2     Venue is proper in this District under 28 U.S.C. §§ 1391(B) and 1400(a) because

a substantial part of the property that is the subject of this action is situated within this judicial

district.

## III.

## SUMMARY OF THE DISPUTE

3.1     This action arises out of Defendants' greed and calculated deceit and betrayal of

award winning composer Bruce Faulconer and his music composition and production company,

Faulconer Productions Music Corporation (collectively referred to as "Faulconer").   In early

1999, Funimation's President, Gen Fukunaga ("Fukunaga") contacted Faulconer regarding the

creation of music for the network television series and feature films related to the Japanese

cartoon titled "DragonBall Z".  The Defendants' lies and deception began at the outset when

Fukunaga represented to Faulconer that Funimation was the sole owner of the DragonBall Z

television series and feature films, when in fact Funimation was merely the licensee of

DragonBall Z.  The true owner of DragonBall Z is Toei Animation Co. Ltd. ("Toei") in Japan.

Unfortunately for Faulconer, this was just the first material misrepresentation in what would eventually become a one-sided relationship fraught with greed and deception.

3.2    After Defendants deceived Faulconer into believing that it was contracting with the owner of DragonBall Z, Defendants fraudulently induced Faulconer to give up the rights to the music Faulconer would create for Funimation in exchange for empty promises of substantial revenue streams in the future.  Instead of fulfilling those promises, Defendants systematically defrauded Faulconer by actively engaging in fraudulent and tortious conduct to keep Faulconer from realizing the promised revenue that was generated from the wildly successful cartoon. While Defendants' deception, greed, and heavy-handed tactics successfully generated it hundreds of millions of dollars in revenue from the various media utilizing Faulconer's award winning music, the promise of substantial revenue never materialized for Faulconer.

3.3    As a result of Defendants' fraud and material breaches of contract, Faulconer filed suit against Defendants to rescind the contracts entered into between Faulconer and Funimation and sought damages and injunctive relief for Defendants' willful infringement of Faulconer's Copyrights. Alternatively, Faulconer sought actual, consequential, and exemplary damages as a consequence of Defendants' fraudulent and tortious conduct and material breaches of contract.

3.4    In August 2004, the parties mediated this case, and came to an agreement in principle regarding the resolution of this case.  The terms of the Settlement Agreement/Release Agreement were negotiated and finalized on January 1, 2005.  All parties executed the agreement, but Defendants breached the settlement terms.

### IV.

### BACKGROUND FACTS

**A.    Summary of Defendants' Actions From the Inception of Faulconer and Defendants' Business Relationship to Immediately Preceding the Parties' Settlement Negotiations**

4.1    **Bruce Faulconer invests his life's savings to start his company.**  Composer
Bruce Faulconer founded Faulconer Productions Music Corporation in 1985 to provide original
music composition and production to the film, television, commercial advertising, corporate
communications and entertainment industries. Starting his company from scratch, Faulconer
built his music production company from the ground up. With long hours and hard work,
Faulconer expanded his client base and rapidly became known in the industry for his
dedication to quality and service.

4.2    In 1998, Faulconer created a world-class music recording and audio post-
production facility, CakeMix Recording, as a part of Faulconer's music creative business.
Faulconer's pursuit of excellence led him to commission the studio's design from the nationally
recognized acoustical architectural firm, Russ Berger Design Group.  By the time Faulconer
contracted with Funimation in 1999, he had gained significant industry recognition and had won
over 80 awards for his music.

4.3    **Funimation and Faulconer form a business relationship.** On February 1,
1999, Fukunaga called Faulconer regarding the possibility of contracting with Faulconer to
provide re-recording, mixing services, sound effects and design and original music
composition for the Japanese anime cartoon DragonBall Z.[1] Fukunaga represented to
Faulconer that Funimation was the sole owner of the DragonBall Z work, including the
television series and feature films. Faulconer would much later find out that, in fact,
Funimation did not own DragonBall Z, but merely had license rights to the work. This

---

[1] DragonBall Z is a 291 episode animated television series that includes three television specials and
thirteen movie features.  The English version of the show is derived from the Japanese version, incorporating

(continued . . . )

distinction would later be the source of major contention between the parties.

4.4     Fukunaga described the project for DragonBall Z as a contract for an episodic, long-term television series with related short form movie projects. Fukunaga explained that he was looking for a composer who was willing to relinquish rights to the music and work at a reduced fee in exchange for a long-term, high volume amount of business with substantial revenue streams in the future from royalties based on television syndication. As additional consideration for relinquishing the rights to the music, Fukunaga specifically indicated that the composer who was awarded the contract would be offered the opportunity to compose the music for all of the DragonBall Z movies that Funimation produced and to provide sound effect sweetening and mixing services for the television series and feature films. Faulconer was also aware of the potential revenue that could be generated from the sales of DragonBall Z compact discs.

4.5     Over the course of the next few weeks, Fukunaga and Faulconer continued to discuss their business arrangement, and on February 22, 1999, Fukunaga awarded the DragonBall Z contract to Faulconer.  The parties negotiated the details of the contract for the next week and on March 1, 1999, Faulconer and Funimation entered into a series of contemporaneously signed agreements, including: (1) a Certificate of Authorship (the "1999 Certificate of Authorship"); (2) an Intellectual Property Rights agreement (the "1999 Intellectual Property Rights Agreement"); (3) a Music Agreement (the "1999 Music Agreement"); and (4) a Mix Agreement (the "1999 Mix Agreement") (collectively, the "1999 Contracts").

4.6     The 1999 Contracts memorialized the discussions and negotiations that had taken

---

( . . . continued)
Japanese created pictures (the visuals) and an English dialogue voice track (translated and recorded by Funimation) and an American soundtrack created by Faulconer (to date – episodes J68 to J291).

place between the parties over the past month. Pursuant to the 1999 Contracts, Faulconer relinquished all rights to the DragonBall Z music, with the exception of 50% of the performance rights (the composer's share) that Faulconer retained, and agreed to compose the DragonBall Z music at a reduced fee. In exchange, and in conformance with the parties negotiations, Funimation agreed to provide the entire DragonBall Z television series (starting with an initial contract comprising the first 50 television episodes)[2] and all feature films that were "owned" by Funimation. Faulconer was also awarded the right to provide sound effect sweetening and mixing services for the television series and feature films (starting with a similar, 50 television episode contract). Although Faulconer was well aware of the potential value of the copyrights relinquished to Funimation, Faulconer was convinced that the deal was economically fair due to the consistent income from a large volume of work (represented by Fukunaga to be nearly 300 television episodes, three television specials and 13 movie features) and substantial revenue streams from television syndication royalties and the potential for future DragonBall Z compact disc sales.

4.7    Shortly after the 1999 Contracts were signed, Faulconer and his production team began work on the DragonBall Z episodes, delivering approximately two episodes per week. The creation of the music proceeded according to schedule, and Faulconer received high praise from Defendants and the public regarding the quality of the music.

4.8    **Funimation begins to change the deal.** Once Defendants induced Faulconer to sign away the ownership rights to the DragonBall Z music, Defendants from that point forward had the upper hand in the business relationship. Defendants recognized this imbalance of power and systematically began to take back the consideration it promised

---

[2] The 1999 Music Agreement provided a schedule for the completion of 50 television episodes beginning with the 68th episode in the series, J68, and continuing through episode J117.

Faulconer in exchange for Faulconer's music rights.

4.9 On December 15, 1999, Fukunaga told Faulconer that Funimation was considering taking the mix of the episodes "in-house" at Funimation – a right specifically granted to Faulconer in the 1999 Mix Agreement. On February 1, 2000, Fukunaga informed Faulconer that Funimation had hired a mixing specialist and equipment to mix the episodes. Although the issue remained up in the air for the next month, it seemed inevitable that Funimation would fail to honor the 1999 Mix Agreement.

4.10 Faulconer delivered what would be its last mix for a DragonBall Z episode on January 7, 2000 – merely 50 episodes into what Defendants represented to be a "long-term" deal. Despite Defendants' satisfaction with Faulconer's high quality mixing work, Funimation put its profits ahead of its obligations to Faulconer and effectively eliminated the mixing revenue specifically bargained for and counted on by Faulconer. By taking away the mixing rights, Funimation eliminated hundreds of thousands of dollars in lost revenue for Faulconer over the next two years and is yet another clear indication that Defendants never intended to honor the promises it made to induce Faulconer into entering the 1999 Contracts.

4.11 **Funimation kills a potential compact disc deal with Kid Rhino.** Defendants' greed and heavy-handed dealings next surfaced when Kid Rhino, a Warner affiliate record label, contacted Funimation regarding marketing Faulconer's DragonBall Z music. On May 9, 2000, Fukunaga asked Faulconer to attend a meeting with Kid Rhino executives to discuss a potential deal to produce DragonBall Z compact discs. At the meeting the next day, Karen Ahmed, the Kid Rhino A. R. R Manager, stated that Kid Rhino was enthusiastically interested in commissioning a compact disc album of Faulconer's DragonBall Z music.

4.12    Over the next three months, the parties attempted to negotiate (or in Defendants' case, failed to negotiate) the details of the project. In conformity with industry standards, Kid Rhino offered to share in the costs of production with Funimation and agreed to provide Faulconer a production advance and royalty points on the compact disc sales. Funimation, however, demanded unreasonable financial terms outside of industry standards and was unwilling to pay for any production costs. Despite Kid Rhino's and Faulconer's enthusiasm for the project, Fukunaga told Faulconer not to sign any deal with Kid Rhino. By the end of July, 2000, Defendants had pulled the plug on the Kid Rhino deal which resulted in a significant loss of revenue to Faulconer.

4.13    **Funimation eliminates Faulconer's syndication revenue.** Prior to the signing of the 1999 Contracts, Fukunaga told Faulconer that Funimation was in negotiations to significantly increase the DragonBall Z syndication revenue. Faulconer relied heavily on these representations when entering into the 1999 Contracts realizing that it would greatly benefit from the syndication revenue. Around the time period of the Kid Rhino negotiations, Faulconer began to inquire into the status of the syndication negotiations. Immediately before the May 10, 2000, Kid Rhino meeting, Fukunaga informed Faulconer that Funimation had entered into an exclusive contract with the Cartoon Network that prohibited DragonBall Z syndication in the United States for the next four years. Obviously, Funimation had struck a deal with the Cartoon Network that was more lucrative to Funimation than its share of television syndication royalties.

4.14    Defendants once again had put its profits ahead of its obligations to Faulconer. Defendants' actions ultimately cost Faulconer hundreds of thousands of dollars in lost royalty revenue over the next four years and is yet another clear indication that Funimation never intended to honor the promises it made to induce Faulconer to enter into

the 1999 Contracts.

4.15   **Funimation and Faulconer finally agree to produce Dragon Ball Z compact discs.** After Funimation killed the Kid Rhino deal, Fukunaga called Faulconer on August 2, 2000, to inform Faulconer that Funimation was willing to self-publish the Dragonball Z compact discs with Faulconer. Fukunaga indicated that self-publishing would allow Funimation to make more money than by partnering with Kid Rhino. Defendants agreed to allow Faulconer the use of DragonBall Z images in marketing the compact discs and agreed to help with sales by promoting the compact discs on Funimation's website. Defendants further represented that it would help with distribution by facilitating retail access to Funimation's favored vendors. Fukunaga desired a Christmas 2000 or Spring 2001 launch for the compact discs with Funimation advertising the compact discs as the record label owner. Faulconer believed that Defendants were genuinely interested in making the self-publication concept work. As Faulconer would soon realize, however, Defendants'excitement stemmed from the expectation of extremely favorable financial terms at Faulconer's expense.

4.16   **The 1999 Music Agreement expires and Faulconer creates music without a contract.** Faulconer delivered the music and mix for episode J117, the 50th and last episode of the 1999 Music Agreement, on January 7, 2000. Shortly thereafter, the parties began negotiating a second contract to cover the remaining DragonBall Z work. On February 7, 2000, Bruce Faulconer met with Fukunaga, Daniel Cocanougher ("Cocanougher"), Funimation's Vice President and Barry Watson ("Watson"), a Funimation Producer, to discuss the details of the second contract.

4.17   **Faulconer files certificates of registration for his DragonBall Z music.** For the next seven months, the parties attempted to reach agreement on the terms for a

second contract, and Faulconer continued to work on the project without a written contract. Despite the lack of a written contract, Faulconer continued to provide high quality and timely music creations at a rate of approximately two episodes per week. Faulconer would ultimately create the music for episodes J118 to J172 before the parties would execute another written contract. On September 6, 2000, prior to the execution of a second contract, Faulconer filed appropriate certificates of registration with the Register of Copyrights for the music created by Faulconer to episodes J118 to J156.

4.18    **Funimation and Faulconer enter into a new Music Agreement.** On September 21, 2000, Funimation and Faulconer entered into a new Music Agreement (the "2000 Music Agreement").[3] The 2000 Music Agreement included a contract for episodes J118 to J291 and conformed to the 1999 Music Agreement and the parties' course of dealing in that Defendants continued to represent that Faulconer remained entitled to compose the music for the entire television series and all of the DragonBall Z feature films pursuant to future contracts.

4.19    The 2000 Music Agreement reduced to writing the compact disc negotiations on terms favorable to Faulconer.[4] With these favorable terms, Faulconer knew that if the parties proceeded to a Christmas 2000 or Spring 2001 launch of the compact discs as previously planned, Faulconer would realize significant income from the

---

[3] Although the 2000 Music Agreement was executed on September 21, 2000, the contract reflected an effective date of February 1, 2000, so that the music created by Faulconer after the expiration of the 1999 Music Agreement would be included in the contract. Funimation was aware that Faulconer had registered the copyrights to t4e music for the episodes that Faulconer created after the expiration of 1999 Music Agreement, and Funimation wanted to protect their interests in this music_ Faulconer was willing to relinquish the rights to the music in exchange for the favorable terms of the 2000 Music Agreement, in particular, the terms upon which Faulconer could create and sell compact discs.

[4] The terms provided that the parties would split any profits or royalties received by Funimation for Funimation's compact disc sales, and Faulconer would keep all of the profits or royalties received by Faulconer's sales.

sales due to the popularity of the DragonBall Z series and Faulconer's music. Unfortunately for Faulconer, Defendants' representations regarding the compact disc deal would once again turn out to be empty promises made to induce Faulconer to continue creating award winning music at little cost to Funimation.

4.20    **Faulconer creates DragonBall Z soundtracks to be released.**  Over the next two months, Faulconer worked diligently on the compact disc project, and by November, 2000, Faulconer had two compact disc soundtracks ready for release. During this same period of time, the parties worked closely to collaborate on advertising ideas and the use of DragonBall Z art images for the cover and inside pamphlet of the compact discs. Specifically, on December 11, 2000, Watson called Faulconer to inform him that Funimation had finished a 60 second commercial promoting the release of Faulconer's first DragonBall Z compact disc, "Trunks Compendium I," that would be placed at the beginning of upcoming Funimation video releases. On December 21, 2000, Watson emailed Faulconer a proposed character image for the Trunks Compendium I compact disc, and on December26, 2000, Watson emailed Faulconer the promotional voice script for the Trunks compact disc that would be on the videotape advertisement promotions.

4.21    **Funimation stalls the compact disc project and discloses that it is not the sole owner of DragonBall Z.** Just when everything seemed to be going according to schedule, Defendants inexplicably started to delay the release of the compact discs. By the beginning of February 2001, Funimation had still not delivered to Faulconer the final images to be used with the Trunks Compendium I compact disc, and Defendants started to give Faulconer the "run around" whenever pressed on the matter. Finally, Fukunaga told Faulconer to talk to Dave Moran ("Moran"), Funimation's Marketing Executive, and on February 13, 2001, Moran told Faulconer that Funimation was willing to give Faulconer ten

percent of the compact disc revenue in exchange for Faulconer's use of the DragonBall Z images.

4.22    Considering the fact that just months prior, the parties had painstakingly negotiated the details of the compact disc deal which was memorialized in the 2000 Music Agreement, Faulconer was dumbfounded by Funimation's offer of ten percent. Faulconer pressed for some explanation, and all he was told was that ten percent was Funimation's best offer because of the costs involved in creating and marketing the compact discs. Finally, on February 27, 2001, Moran told Faulconer that the "real reason" for the high costs to Funimation was that Toei Animation, Ltd. and/or FUGI Music ("Toei") owned the rights to the DragonBall Z music, and Funimation and Faulconer would have to pay royalties to Toei.

4.23    From the beginning of the parties relationship, Funimation represented to Faulconer that Funimation was the sole owner of the DragonBall Z television series and feature films. The parties contemplated the production of compact discs early on in the relationship, and Faulconer's right to produce compact discs was one of the cornerstones of the negotiations leading to the signing of the 2000 Music Agreement. Now, for the first time, Funimation implied to Faulconer that another company owned the music rights to DragonBall Z. In fact, Faulconer would learn much later on that Funimation owned nothing but the license rights to DragonBall Z – not even close to the representation that it was the *sole* owner.

4.24    Defendants deliberately deceived Faulconer into believing Funimation was the sole owner of DragonBall Z so that Faulconer would believe Funimation had the authority to grant Faulconer various DragonBall Z rights, including the right to create compact discs without the need to get approval or share profits with any company other

than Funimation. This deception went to the core of the dealing between the parties and is consistent with the manner in which Defendants approached every business deal with Faulconer.

4.25   **Funimation demands that Faulconer agree to substantially alter the financial terms of the compact disc agreement.**   Funimation's heavy-handed negotiating and dishonest tactics became apparent in March 2001. On March 13, 2001, Moran informed Faulconer that Funimation would not be sending Faulconer the final DragonBall Z images. A week later, on March 21, 2000, Stephanie Giotes ("Giotes"), Funimation's General Counsel, told Faulconer that he was not important to Funimation and that the compact disc project was not important in the grand perspective of Funimation's relationship with Toei. Faulconer would later discover that Funimation was attempting to secure additional license rights to other Toei programs, and Funimation did not want to do anything to jeopardize those lucrative deals. Therefore, Defendants insisted that Faulconer enter into an amendment to the 2000 Music Agreement.

4.26   On March 26, 2001, Giotes emailed Faulconer a proposed Amendment One to the 2000 Music Agreement ("Amendment One"). Amendment One proposed a substantial change to the financial arrangement regarding profit sharing from the sales of compact discs without any additional consideration from Funimation.[5] Amendment One was completely unacceptable to Faulconer which had specifically bargained for the ability to keep all of the profits generated from Faulconer's own sales. On April 18, 2001, Faulconer sent Giotes a letter protesting Amendment One and requested that the final images be sent

---

[5] Under the 2000 Music Agreement, Funimation is not entitled to any profits or royalties as a result of Faulconer's compact disc sales. This was significant to Faulconer when agreeing to the terms of the 2000 Music Agreement. Under the Amendment, Funimation would have been entitled to half of the profits or royalties

(continued . . . )

pursuant to the parties prior discussions.

4.27    Giotes called Faulconer the next day to discuss Faulconer's letter. She reiterated Funimation's position that Toei was due royalties which would be deducted out of Faulconer's compact disc revenue. Giotes again stated that Faulconer was insignificant to Funimation in that Faulconer represented only one percent of Funimation's overall business dealings. Finally, Giotes threatened Faulconer that if he did not sign Amendment One, no distributor would touch Faulconer's compact discs because Funimation would withhold their blessing.

4.28    Faulconer was appalled by Giotes' unprofessional and unethical behavior which he felt amounted to extortion. Faulconer had an agreement specifically granting Faulconer the ability to sell compact discs with the use of the DragonBall Z images. During the Kid Rhino negotiations and throughout the self-publication negotiations, the DragonBall Z images had always been an intricate part of the process, and at no time had anyone ever mentioned Toei royalties or that there was the possibility the images could not be used by Kid Rhino or Faulconer. With their threats and words of intimidation, Giotes and Funimation had once again stepped over the ethical lines of doing business. Faulconer never executed Amendment One and was forced to produce the compact discs on its own without Funimation and without the use of the DragonBall Z images.

4.29    **Funimation fails to honor the 2000 Music Agreement schedule.** A regular and predictable schedule was an essential part of the 1999 and 2000 Music Agreements, and it was critical to the planning and management of Faulconer's overhead. To meet the scheduling and creative demands of the DragonBall Z series

---

( . . . continued)

generated by Faulconer's sales (option a), or Faulconer would have to give up approximately 88% of Faulconer's existing revenue opportunities relating to compact disc sales (option b).

required Faulconer to maintain a highly trained staff and limited its availability to work on other creative commitments outside of DragonBall Z. The average market value for the type of music Faulconer created for DragonBall Z was approximately $1000 per minute of music, or $22,000 per episode. Faulconer understood that it was creating the music for the DragonBall Z project at an extreme discount. Faulconer was willing to work at this discount, however, so long as it secured a large volume of work to be delivered at a consistent rate. Faulconer accomplished this by obtaining the rights to the entire DragonBall Z series at a rate of approximately two episodes per week.

4.30   The 2000 Music Agreement provided that Faulconer would deliver approximately two episodes per week except that Faulconer would be required to deliver three episodes per week during the months of August, September and October 2000. For the most part, the parties proceeded along a schedule consistent with the 2000 Music Agreement. In late December 2000, however, Funimation started to deliver approximately one show per week. On many occasions over the next six months, Faulconer asked Defendants why the episodes were not being provided to it according to the agreed schedule and the parties' course of dealing. Funimation informed Faulconer that it was concentrating on other higher priority projects that were preventing Funimation from concentrating on DragonBall Z. Finally, on July 31, 2001, Watson informed Faulconer that Funimation's commitments to its other shows had lessened.   Nevertheless, Funimation would only deliver one episode per week.   Despite the fact that Faulconer had never delivered an episode behind schedule and was always able to meet Funimation's needs, Funimation made a calculated decision to cut back on the delivery of the episodes at Faulconer's expense.[6]

---

[6] In fact, on December 21, 2000, at 7:17 p.m., Watson called Faulconer and requested that an extra episode (J200) be completed in 24 hours due to a deadline Funimation needed to meet.  The Faulconer team rose to the

(continued . . . )

4.31    The remaining episodes could have easily been finished by the end of 2001 if Funimation would have honored the two episodes per week schedule provided for in the 2000 Music Agreement. Funimation, however, decided to string out the delivery of the episodes fully aware of the fact that such a delay would cost Faulconer a considerable amount of additional overhead. Because of Funimation's delay, Faulconer was prevented from completing the last DragonBall Z episode of the 2000 Music Agreement (J291) until October 28, 2002.

4.32    **Faulconer produces and distributes the compact discs without Funimation.** After Giotes' threatened Faulconer and issued an ultimatum to sign the unconscionable Amendment One, Faulconer had little choice but to salvage what little income he could from the deal by producing the DragonBall Z compact discs on its own. On June 6, 2001 Faulconer released the first two DragonBall Z compact discs ("Trunks Compendium I" and "The Best of DragonBall Z Volume 1") without Funimation's input or involvement and without the use of the DragonBall Z images.[7]

4.33    **Funimation tortiously interferes with Faulconer's ability to sell the compact discs.** Due to the interest for Faulconer's music in Europe, on August 25, 2001, Faulconer contacted Tony Allen ("Allen") with MVM in Chepstow, England regarding European distribution of Faulconer's DragonBall Z compact discs. Allen responded very favorably to doing business with Faulconer, and the parties proceeded to negotiate an agreement for the sale of thousands of compact discs for European distribution over the next few months.

---

( . . . continued)
challenge and completed the episode on late Friday evening, December 22, 2000 – the Friday before Christmas Eve weekend.

4.34   On October 31, 2001, however, Allen informed Faulconer via email that Fukunaga had contacted him and warned him not to do business with Faulconer because Faulconer was not supposed to be selling DragonBall Z compact discs. Fukunaga's statement was directly contrary to the CD agreement. Faulconer called Allen the next day and tried to convince him that Faulconer did in fact have the right to produce and distribute DragonBall Z compact discs. Despite Faulconer's best efforts and Allen's agreement to listen to some of Faulconer's demos, the damage was done.

4.35   The situation became worse after Allen received Faulconer's demo compact discs. Allen commented to Faulconer that the compact discs looked "unofficial" because they did not have any DragonBall Z images or logos on them. Due to Fukunaga's threats, and the Defendants' refusal to allow Faulconer the use of the DragonBall Z images, Allen refused to negotiate any further with respect to a high volume distribution agreement. After months of attempting to convince Allen that Faulconer did have the right to distribute DragonBall Z compact discs. Allen cautiously placed a limited test order.

4.36   In March, 2002, Allen placed a commercial order for each of Faulconer's compact discs ("Trunks compendium I," "The Best of DragonBall Z Volume 1" and "The Best of DragonBall Z Volume 2"[8]). Prior to Defendants' interference, Faulconer and Allen had been contemplating entering into an agreement for the sale of thousands of compact discs for European distribution. After Fukunaga's threats, MVM became very cautious in its approach to Faulconer resulting in hundreds of thousands of dollars in lost revenues to Faulconer. Faulconer had once again become painfully aware of Defendants' motto for doing

---

( . . . continued)

[7] On May 6, 2002, Faulconer filed appropriate certificates of registration with the Register of Copyrights for the music contained in each compact disc.

[8] On May 6, 2002, Faulconer filed appropriate certificates of registration with the Register of Copyrights for the music contained on The Best of DragonBall Z Volume 2.

business — threaten and attack the little guy from all angles to increase the big company's profits.

4.37    **Funimation makes baseless claims for royalty payments and threatens to sue Faulconer and terminate the parties' agreement.**   At the same time Fukunaga was threatening Allen, Giotes opened up a fresh attack on Faulconer. On November 2, 2001, Giotes sent a letter to Faulconer demanding royalty statements and Funimation's share of the compact disc profits.   Needless to say, Faulconer was puzzled in light of the parties lengthy negotiations that resulted in Faulconer's rejection of Funimation's proposed Amendment One that would have required Faulconer to pay profits to Funimation.   Nevertheless, Goites continued to demand royalty payments and threatened Faulconer with a lawsuit and termination of the 2000 Music Agreement.

4.38    **Funimation fails to honor the 1999 and 2000 Music Agreements by awarding movies to composers other than Faulconer.** A major consideration for Faulconer in relinquishing the rights to the DragonBall Z music was Faulconer's ability to create the music for the DragonBall Z feature films. This consideration was memorialized in the 1999 and 2000 Music Agreements and was discussed between the parties at many points during their relationship. On June 25, 2001, Faulconer was surprised to discover from Funimation's website that the first movie that was promised to Faulconer, Movie 4: Lord Slug ("Movie 4") had been completed and was scheduled for release on August 7, 2001. The music for the movie had been offered to the rock bands "Deftones" and "Disturbed" instead of Faulconer as contemplated in the 1999 and 2000 Music Agreements. Not only was Movie 4 not offered to Faulconer, but it is Faulconer's belief that it utilized over seven minutes of Faulconer's music without proper attribution or royalty payments to Faulconer.

4.39    Faulconer would eventually discover that Lord Slug was not the first film

awarded to composers other than Faulconer in violation of the 1999 and 2000 Music Agreements. Funimation had created two television specials and another movie, Movie 5: Cooler's Revenge ("Movie 5"), without Faulconer. Instead of complaining, Faulconer strived to convince Defendants that the movies would be better if Funimation used Faulconer's original music creations instead of applying pre-existing rock band music to the movies.

4.40   **Funimation awards Movie 6 to Faulconer, and Faulconer begins work on the project.**  Faulconer's perseverance eventually paid off, and on April 4, 2002, the parties met at Funimation's offices to discuss Movie 6: The Return of the Cooler ("Movie 6"), as well as a new television series, DragonBall GT. After detailed discussions regarding the specific parameters of the project, the parties came to an understanding of how the project would proceed. On April 8, 2002, Cocanougher called Faulconer to award Movie 6 to Faulconer. Cocanougher and Faulconer reconfirmed the details for the movie, and Cocanougher said that Funimation would send a contract to Faulconer memorializing the parties verbal agreement. Faulconer was very pleased with the recent developments, but this feeling of satisfaction would not last long.

4.41   **Funimation attempts to use the Movie 6 contract to eliminate all of Faulconer's existing rights including substantial Internet use royalties.**  Instead of sending a contract specifically governing Movie 6, on April 18, 2002, Giotes sent Faulconer a Work for Hire Music Agreement ("Work for Hire Agreement") governing the entire relationship between the parties. The proposed Work for Hire Agreement not only completely misstated the parameters of Movie 6 that were agreed to by Cocanougher, but it eliminated significant rights that had been granted to Faulconer in the 1999 Contracts and 2000 Music Agreement.

4.42    On April 30, 2002, Giotes called Faulconer to pressure him into signing the Work for Hire Agreement and stated that Funimation was 24 hours away from hiring someone else. Faulconer explained his reservations with the proposed Work for Hire Agreement. On May 3, 2002, Cocanougher called Faulconer to inquire into the hold up with the new agreement, and Faulconer again explained his reservations with the proposed agreement and that he was waiting on Giotes to correctly memorialize the agreement the parties had reached at the April 4, 2002, meeting. That same day, Giotes called Faulconer to inform him that many of the rights that had be eliminated from the Work for Hire Agreement would be given back to him and that she would forward a new agreement.

4.43    The new agreement, sent to Faulconer on the evening of May 3, 2002, continued to misstate the parameters of the Movie 6 project and eliminate significant rights previously granted to Faulconer in agreements that Faulconer believed were still valid and in existence.  Faulconer informed Giotes on May 7, 2002, that he was making some changes to the new proposal, but Giotes hastily responded with an ultimatum that if Faulconer did not sign the new agreement by noon on May 9, 2002, she would find someone else for the project. Faulconer did not understand the pressure that was being applied or why Giotes was threatening to remove Faulconer from the project. Faulconer was on schedule and making good progress on Movie 6, and the parties already had existing contracts governing the movies.

4.44    Faulconer revised the Work for Hire Agreement and sent it to Giotes on May 9, 2002, before Giotes' imposed deadline. Later that evening, Giotes faxed Faulconer what would end up being Funimation's last proposal. This latest version had restored almost all of the rights the original Work for Hire Agreement eliminated. However, the agreement still

eliminated Faulconer's performance rights to every media except television.[9] Therefore, Faulconer's attorney called Giotes on the morning of May 10, 2002, to determine whether Funimation would revise the agreement so that it was consistent with the parties course of dealing regarding performance rights. After some discussions, Giotes hung up the phone on Faulconer's attorney. Shortly thereafter, Faulconer received a letter from Giotes formally withdrawing Funimation's offer regarding Movie 6.

4.45    Faulconer was again completely shocked at Giotes' lack of professionalism. Faulconer made a final plea to Giotes by letter dated May 10, 2002, to see if Giotes would simply correct the performance rights issue. Giotes responded the same day by stating that Funimation's position was that the parties never had any kind of agreement for Faulconer to work on Movie 6. Giotes' threats and misrepresentations had now turned to plain delusional fantasies. Considering the fact that Faulconer had been working tirelessly for more than a month on Movie 6, working closely with the Funimation production staff throughout the entire process, no one could possibly believe that the parties did not have a deal to collaborate on Movie 6.

4.46    On May 13, 2002, in a final attempt to salvage the business relationship, Faulconer sent a letter to Daniel Cocanougher, again explaining that Giotes and Faulconer were merely in disagreement regarding certain performance rights. Later that day, Faulconer tried to call Robert Cocanougher, another Vice-President of Funimation, to

---

[9] During these negotiations, Giotes repeatedly stated that the Work for Hire Agreement did not need to address performance rights because Funimation was not going to broadcast the movies. Given Funimation's past false representations, Faulconer was suspicious of this claim and insisted that Faulconer continue to have performance rights. Faulconer's suspicions were once again well founded as the movies "The Bardock special" and "The History of Trunks" were recently broadcast on the Cartoon Network on September 5th and 12th, 2003, respectively. Additionally, on September 19, 2003, Movie 5 was broadcast on the Cartoon Network, and on September 26, 2003, Movie 6, the movie Giotes adamantly stated would never be broadcast, was in fact broadcast on the Cartoon Network. This is yet another example of Funimation's calculated deceit and misrepresentations during negotiations with Faulconer.

discuss the situation, but his father and CEO of Funimation, Alan Cocanougher, answered the phone. Alan Cocanougher told Faulconer that Funimation "could get lots of composers to do the job" and despite the fact that Giotes withdrew the offer, Faulconer could still sign the contract "as is."

4.47    In what would become the parties last communication regarding Movie 6, on May 15, 2002, Daniel Cocanougher called Faulconer and told him that "there was a mile long line of composers waiting to do this stuff" and that "Funimation does contracts and people sign them." Cocanougher said Funimation did not want to pay Faulconer for the use of Faulconer's music on the internet, so if Faulconer did not sign the Work for Hire Agreement "as is," the deal was "dead." Funimation knew that it had been using Faulconer's music on its website 24 hours a day, seven days a week, since early 2000 without paying Faulconer royalties which amounted to hundreds of thousands of dollars.[10]  Cocanougher's comments made it clear that Funimation was using the Movie 6 Work for Hire Agreement to try to trick Faulconer into relinquishing those royalty rights along with just about everything else Funimation had granted Faulconer. Given the fact that Funimation had already gutted Faulconer of most of the revenue opportunities granted to Faulconer in the 1999 Contracts and the 2000 Music Agreement, Faulconer was not about to relinquish its internet royalty rights without just compensation.

4.48    **Funimation continues to tortiously interfere with Faulconer's ability to sell compact discs.**    Although Defendants continued to avoid their obligations to Faulconer, they did not stop interfering with Faulconer's rights to sell compact discs. In the beginning of June, 2002, Faulconer entered into negotiations with Beckett Magazine

---

[10] Funimation ceased using Faulconer's music on the internet when it launched its new website on December 22, 2002.

("Beckett") regarding the sale of Faulconer's DragonBall Z compact discs. Beckett responded favorably to advertising and selling Faulconer's compact discs through its magazine. On June 7, 2002, Mike Obert of Beckett called Funimation to inquire about Faulconer's compact disc rights. Giotes threatened Obert and would not give Beckett Funimation's blessing to sell Faulconer's compact discs.

4.49    On June 14, 2002, Obert called Faulconer to inform him that Beckett's owner had surprisingly decided not to sell Faulconer's compact discs. A couple of months later, on August 12, 2002, Faulconer and Carolyn Kynard ("Kynard"), Faulconer's Marketing Director, contacted Obert to make additional inquiries. Obert told them that Funimation had threatened Beckett's publication rights if it sold Faulconer's compact discs, and that Beckett would not advertise for Faulconer because it did not want to antagonize Funimation.

4.50    In December, 2002, Beckett finally decided to carry Faulconer's compact discs despite Funimation's threats. However, it was not until March, 2003, that Beckett displayed all of Faulconer's compact discs for sale. Despite the enormous delay caused by Funimation at a time DragonBall Z was at its peek in popularity on the Cartoon Network, Faulconer's compact discs became one of Beckett's best selling products. Funimation effectively prevented Faulconer from selling its compact discs through Beckett for almost nine months causing Faulconer a significant loss in sales.

4.51    **Funimation continues to not honor the representations made to Faulconer.** Despite the fact that Funimation promised Faulconer the rights to compose the music for the entire DragonBall Z series and feature films in exchange for relinquishing his ownership rights to the music, Funimation continues to use composers other than Faulconer. To date, Funimation has released Movies 4 - 8 and a number of feature film

specials without Faulconer's input. Additionally, Funimation has recently announced that it will release the first 67 episodes of DragonBall Z.

**B.     Summary of Defendants' Actions During the Settlement Negotiations Through the Breach of the Settlement Agreement**

4.52     **Defendants do not honor the Settlement Agreement with Faulconer.**   In August 2004, the parties attended mediation and reached an agreement in principle on settlement terms.   From August 2004 until December 31, 2004, Faulconer and the Defendants negotiated the terms of the settlement, which were memorialized in a Compromise and Settlement Agreement ("Settlement Agreement") dated January 1, 2005 and signed by all parties that same day.   Among other things, the Settlement Agreement obligated the Defendants to make a lump sum payment of $125,000 to Faulconer.

4.53     During the negotiations of the settlement documents, Faulconer was advised by Defendants that Funimation was in the process of finalizing the sale of a significant amount of stock that would generate a multi-million dollar profit for the Defendants.   Shortly after this discovery, Defendants advised Faulconer that if he had an interest in resolving the case, he must do so before the Funimation sale was finalized on January 1, 2005.   To further induce Faulconer's expedient agreement on important settlement terms, Defendants advise Faulconer that he knows of and will be pleased regarding the identity of the new significant owners of Funimation.   This representation was made to induce Faulconer into closing the settlement so that Funimation could represent in its stock sale that a major piece of litigation and risk was resolved – to the profit of Defendants.

4.54     Among the most crucial terms of the Settlement Agreement, Funimation Productions, Ltd. agreed to enter into a license agreement with Faulconer so that Faulconer could sell DragonBall Z CDs of the music that was created by Faulconer and synchronized with the DragonBall Z cartoons.   Although the license agreement and settlement payment were

contingent upon Toei's approval, Defendants made numerous representations to Faulconer that Toei's approval was a mere formality and that Defendants had, for all practical purposes, full authority to enter into this agreement.

4.55    These representations ultimately proved to be false, as Toei did not approve the Settlement Agreement and license agreement or it was never presented for their approval. Defendants knew and believed that Toei would not approve either agreement throughout the course of the discussions and negotiations with Faulconer; rather, the representations were made to induce Faulconer to give the appearance of having resolved the lawsuit so that Defendants' sale of Funimation – and resulting multi-million dollar profits – could be consummated.   Or, again, Toei was never presented the settlement and license agreement for consideration.

4.56    In furtherance of Defendants' scheme, following the execution of the Settlement Agreement Defendants tendered to Faulconer a check in the amount of $125,000 while repeatedly urging it to dismiss the lawsuit so that their sale could be finalized.  After Faulconer refused to dismiss the lawsuit, and after Defendants had nevertheless finalized the sale of the company, Defendants stopped payment on the settlement check and advised Faulconer that Toei did not approve either agreement.

## V.

## CLAIMS FOR RELIEF

**A.     Claims Associated With Defendants' Actions From the Inception of Faulconer and Defendants' Business Relationship to Immediately Preceding the Parties' Settlement Negotiations**

**I.     First Claim for Relief: Federal Copyright Infringement (17 U.S.C. § 101, et seq.)**

5.1     Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.2   At all relevant times, Faulconer owned the rights, title and interest in and to the copyrights to the music for DragonBall Z episodes J118 to J156, and the music contained on the Faulconer created compact discs Trunks compendium I, The Best of DragonBall Z Volume 1, The Best of DragonBall Z Volume 2, The Best of DragonBall Z Volume 3,[11] The Best of DragonBall Z Volume 4,[12] BUU—The Main Sagas,[13] and Android 18—The Android Sagas[14] (collectively, "Faulconer Copyrights").

5.3   Faulconer has complied in all respects with Title 17 of the United States Code, secured the exclusive rights and privileges in and to the Faulconer Copyrights, and in compliance with the law has received from the Register of Copyrights the appropriate certificates of registration, which constitute *prima facie* evidence of the validity of the Faulconer Copyrights and of the facts stated in the certificates.

5.4   After the dates of registration of the Faulconer Copyrights and continuing to date, Funimation has infringed on the Faulconer Copyrights by importing, manufacturing, advertising, selling, and/or offering for sale, without Faulconer's consent, the infringing products which are copies of or bear a substantial similarity to the Faulconer Copyrights.

5.5   Upon information and belief, said conduct by Funimation was and is willfully done with knowledge of the Faulconer Copyrights.

5.6   Faulconer has no adequate remedy at law. The said conduct of Funimation has caused and, if not enjoined, will continue to cause irreparable damage to the rights of

---

[11]On June 13, 2002, Faulconer filed an appropriate certificate of registration with the Register of Copyrights for the music contained on The Best of DragonBall Z Volume 3.

[12]On April 30, 2003, Faulconer filed an appropriate certificate of registration with the Register of Copyrights for the music contained on The Best of DragonBall Z Volume 4.

[13]On April 30, 2003, Faulconer filed an appropriate certificate of registration with the Register of Copyrights for the music contained on BUU—The Majin Sagas.

Faulconer in the Faulconer Copyrights.

5.7    As a result of Funimation's wrongful conduct, Faulconer is entitled to damages and an injunction restraining Funimation, its officers, agents and employees, and all persons acting in concert with it, from engaging in further such acts in violation of the copyrights laws.

## II.    Second Claim for Relief: Constructive Trust

5.8    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.9    Upon information and belief, Funimation owns and/or possesses tangible real and/or personal properties and assets including, but not limited to, bank, savings, and/or other financial accounts, consisting of and/or obtained by profit derived from Funimation's unauthorized manufacture, distribution, and/or sale of products infringing on Faulconer's Copyrights.

5.10    Faulconer is entitled to the profits Funimation has derived from the infringement of Faulconer's Copyrights under 17 U.S.C. § 504(b).

5.11    Faulconer has no adequate remedy at law and has suffered irreparable harm and damage as a result of Funimation's acts as described above. Funimation holds those tangible real and/or personal properties and assets consisting of and/or obtained by profit derived from Funimation's infringing activities as constructive trustees for the benefit of Faulconer, in an amount thus far not determined.

## III.    Third Claim for Relief: Fraudulent Inducement

5.61    Faulconer realleges each and every allegation set forth in the preceding

---

( . . . continued)
    [14]On April 30, 2003, Faulconer filed an appropriate certificate of registration with the Register of Copyrights for the music contained on Android 18—The Android Sagas.

paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.61   Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealings between the parties, Funimation made material representations to Faulconer regarding promises of Funimation's future performance.

5.14   The representations made to Faulconer were false in that when the promises were made, Funimation had no intention of performing the promises and made the promises despite the fact that it knew the promises were false or made them recklessly without any knowledge of the truth and as a positive assertion.

5.15   When Funimation made the representations, it intended or had reason to expect that Faulconer would act in reliance on the representations.

5.16   Faulconer detrimentally relied on Funimation's false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## IV.   Fourth Claim for Relief: Fraudulent Misrepresentation

5.17   Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.18   Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealings between the parties, Funimation made material representations to Faulconer.

5.19   The representations were false in that Funimation made false statements of fact, false statements of opinion and failed to disclose material facts when it had such a duty.

5.20   When Funimation made the representations, it knew the representations were false or made them recklessly without any knowledge of the truth and as a positive

assertion.

5.21    When Funimation made the representations, it intended or had reason to expect that Faulconer would act in reliance on the representations.

5.22    Faulconer detrimentally relied on Funimation's false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## V.      Fifth Claim for Relief: Negligent Misrepresentation

5.23    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.24    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealings between the parties, Funimation made representations to Faulconer in the course of Funimation's business or in a transaction in which Funimation had an interest.

5.25    Funimation supplied false information for the guidance of others.

5.26    Funimation did not exercise reasonable care or competence in obtaining or communicating the information.

5.27    Faulconer justifiably relied on Funimation's representations, and the negligent representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## VI.     Sixth Claim for Relief: Breach of Contract

5.28    Pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.29    The 1999 Contracts, the 2000 Music Agreement between Faulconer and Funimation were valid and enforceable.

5.30    At all times, Faulconer performed his contractual obligations.

5.31    Funimation's failure to perform as agreed constitutes material breaches of the 1999 Contracts and the 2000 Music Agreement and has caused, and continues to cause, Faulconer injury in an amount which is in excess of the minimum jurisdictional limits of this Court.

**VII.    Seventh Claim for Relief: Tortious Interference With A Contract**

5.32    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.33    Faulconer entered into an agreement with MVM to sell compact discs. That agreement was subject to interference by Funimation.

5.34    Funimation willfully and intentionally interfered with the agreement between Faulconer and MVM.

5.35    Funimation's interference proximately caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

**VIII.   Eighth Claim for Relief: Tortious Interference With A Prospective Contract**

5.36    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.37    There was a reasonable probability that Faulconer would have entered into a business relationship with Beckett.

5.38   Funimation intentionally interfered with the business relationship between Faulconer and Beckett.

5.39   Funimation's conduct was independently tortious, and the interference proximately caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## IX.   Ninth Claim for Relief: Unjust Enrichment

5.40   Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.41   Funimation has retained benefits resulting from their wrongful acts to the detriment of Faulconer. Thus, in the absence of an express or implied-in-fact contract, Faulconer is entitled to recover for the unjust enrichment retained by Funimation.

5.42   As a result of Funimation's actions referenced herein, Faulconer has suffered and continues to suffer damages in an amount in excess of the minimum jurisdictional limits of this court.

## X.   Tenth Claim for Relief:  Conspiracy to Commit Fraud

5.43   Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.44   Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealing between the parties, Defendants acted together to commit fraud.

5.45   Defendants had a meeting of the minds to commit fraud, and that course of action was ultimately furthered by the acts and/or omissions by Funimation.

5.46    Defendants' wrongful acts proximately caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## XI.    Eleventh Claim for Relief:  Breach of the Duty of Good Faith and Fair Dealing

5.47    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.48    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealing between the parties, a special relationship between the parties existed that gave rise to the duty of good faith and fair dealing.

5.49    Defendants made material representations to Faulconer regarding promises of Funimation's and Toei's future performance.

5.50    The representations made to Faulconer were false in that when the promises were made, Defendants had no intention of performing the promises and made the promises despite the fact that they knew the promises were false or made them recklessly without any knowledge of the truth and as a positive assertion.

5.51    When Defendants made the representations, they intended or had reason to expect that Faulconer would act in reliance on the representations.

5.52    Faulconer detrimentally relied on Defendants false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## XII.    Twelfth Claim for Relief:  Negligence

5.53    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.54    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealing between the parties, Defendants owed a duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Faulconer.

5.55    Defendants breached that duty by making material representations to Faulconer regarding promises of Funimation's and Toei's future performance that were false when made.

5.56    Faulconer detrimentally relied on Defendants false representations, and these false representations proximately caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

**B.      In the Alternative, Faulconer Asserts the Following Claims Associated With Defendants' Actions Surrounding the Breach of the Settlement Agreement**

**I.      First Alternative Claim for Relief: Fraudulent Inducement**

5.57    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.58    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire settlement negotiations between the parties, Funimation made material representations to Faulconer regarding promises of Funimation's future performance.

5.59    The representations made to Faulconer were false in that when the promises were made, Funimation had no intention of performing the promises and made the promises despite the fact that it knew the promises were false or made them recklessly without any knowledge of the truth and as a positive assertion.

5.60    When Funimation made the representations, it intended or had reason to expect that Faulconer would act in reliance on the representations.

**Plaintiff's Second Amended Complaint**                                                              **Page 34**
179923.1

5.61    Faulconer detrimentally relied on Funimation's false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## II.    Second Alternative Claim for Relief: Fraudulent Misrepresentation

5.62    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.63    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire settlement negotiations between the parties, Funimation made material representations to Faulconer.

5.64    The representations were false in that Funimation made false statements of fact, false statements of opinion and failed to disclose material facts when it had such a duty.

5.65    When Funimation made the representations, it knew the representations were false or made them recklessly without any knowledge of the truth and as a positive assertion.

5.66    When Funimation made the representations, it intended or had reason to expect that Faulconer would act in reliance on the representations.

5.67    Faulconer detrimentally relied on Funimation's false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## III.    Third Alternative Claim for Relief: Negligent Misrepresentation

5.68    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.69    Prior to any contractual relationship between Funimation and Faulconer, and

throughout the entire settlement negotiations between the parties, Funimation made representations to Faulconer in the course of Funimation's business or in a transaction in which Funimation had an interest.

5.70   Funimation supplied false information for the guidance of others.

5.71   Funimation did not exercise reasonable care or competence in obtaining or communicating the information.

5.72   Faulconer justifiably relied on Funimation's representations, and the negligent representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## IV.   Fourth Alternative Claim for Relief: Breach of Contract

5.73   Pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.74   The Settlement Agreement and License Agreement between Faulconer and Funimation were valid and enforceable.

5.75   At all times, Faulconer performed his contractual obligations.

5.76   Funimation's failure to perform as agreed constitutes a material breach of the Settlement Agreement and License Agreement and has caused, and continues to cause, Faulconer injury in an amount which is in excess of the minimum jurisdictional limits of this Court.

## V.   Fifth Alternative Claim for Relief:  Conspiracy to Commit Fraud

5.77   Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.78    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire business dealing between the parties, Defendants acted together to commit fraud.

5.79    Defendants had a meeting of the minds to commit fraud, and that course of action was ultimately furthered by the acts and/or omissions by Funimation.

5.80    Defendants' wrongful acts proximately caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## VI.    Sixth Alternative Claim for Relief:   Breach of the Duty of Good Faith and Fair Dealing

5.81    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.82    Prior to any contractual relationship between Funimation and Faulconer, and throughout the entire settlement negotiations between the parties, a special relationship between the parties existed that gave rise to the duty of good faith and fair dealing.

5.83    Defendants made material representations to Faulconer regarding promises of Funimation's and Toei's future performance.

5.84    The representations made to Faulconer were false in that when the promises were made, Defendants had no intention of performing the promises and made the promises despite the fact that they knew the promises were false or made them recklessly without any knowledge of the truth and as a positive assertion.

5.85    When Defendants made the representations, they intended or had reason to expect that Faulconer would act in reliance on the representations.

5.86    Faulconer detrimentally relied on Defendants false representations, and the false representations caused injury to Faulconer in an amount which is in excess of the minimum jurisdictional limits of this Court.

## VII.    Seventh Alternative Claim for Relief:  Intentional Infliction of Emotional Distress

5.87    Further pleading in the alternative, Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

5.88    As a result of Defendants' intentional or reckless actions referenced herein, Bruce Faulconer has suffered severe emotional distress.

5.89    Defendants' extreme and outrageous conduct proximately caused Bruce Faulconer's severe emotional distress.

5.90    There is no alternative cause of action that would provide a remedy for the severe emotional distress caused by the Defendants.

## VI.

## DAMAGES/RELIEF SOUGHT

6.1    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

6.2    Pursuant to §37.00 *et seq.* and §38.001 *et seq.* of the Texas Civil Practice and Remedies Code and 17 U.S.C. § 101, et seq., Faulconer is entitled to reasonable attorneys' fees.  Faulconer is further entitled to receive its reasonable expert fees, costs of court, and pre judgment and post judgment interest at the highest rates allowed by law.

6.3    Faulconer seeks the following in damages as a result of Defendants' copyright infringement: (i) actual damages in an amount to be determined at trial, together with Defendants profits derived from their unlawful infringement of Faulconer's

Copyrights; or (ii) statutory damages for each act of infringement in an amount provided by law, as set forth in 17 U.S.C. § 504, at Faulconer's election before entry of a final judgment.

6.4    Faulconer requests that the Defendants be enjoined from directly or indirectly infringing on Faulconer's Copyrights or continue to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copies from Faulconer's Copyrights or to participate or assist in any such activity.

6.5    Faulconer requests that the Defendants be enjoined to return to Faulconer any originals, copies or duplicates of Faulconer's Copyrights in Defendants' possession, custody or control.

6.6    Faulconer requests that the Defendants be enjoined to recall from all distributors, wholesalers, jobbers, dealers, retailers, non-Faulconer-licensed customers and distributors, and all others known to Defendants any originals, copies or duplicates of any works shown by the evidence to infringe any Faulconer Copyright.

6.7    Faulconer requests that the Defendants be required to account for and pay over to Faulconer all gains, profits, and advantages derived from Defendants' acts of infringement.

6.8    Faulconer requests that all gains, profits, and advantages derived from Defendants' act of infringement and other violations of law be deemed to be in constructive trust for the benefit of Faulconer.

6.9    Faulconer requests that judgment be entered for Faulconer and against Defendants, for fraud and the trebling of the damages awarded.

6.10   Faulconer requests that the 1999 Contract and 2000 Music Agreement entered into between Faulconer and Faulconer be rescinded.

6.11    Faulconer requests that it be awarded actual, consequential, and exemplary damages as a consequence of Defendants' intentional, fraudulent, and tortious conduct surrounding the material breaches of the 1999 Contracts, 2000 Music Agreement, and Settlement Agreement.

6.12    Faulconer requests that it be awarded its attorney's fees incurred in the trial of this matter as well as all contingent interest for all possible appeals pursuant to a cause of action for attorney's fees herein.

6.13    Faulconer requests that pre-judgment and post-judgment interest at the highest lawful rate be assessed on all sums be awarded herein from the date of judgment until paid.

6.14    That all costs of court be assessed against Defendants.

6.15    That the court grant such other, further, and different relief as the court deems proper under the circumstances.

## VII.

### CONDITIONS PRECEDENT

7.1    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complaint and incorporates them by reference herein.

7.2    All conditions precedent to the institution of this lawsuit have been performed, have occurred or have been waived.

## VIII.

### NO WAIVER OR ELECTION

8.1    Faulconer realleges each and every allegation set forth in the preceding paragraphs of this Second Amended Complain and incorporates them by reference herein.

8.2   By filing this lawsuit, Faulconer does not waive or release any rights, claims, causes of action, or defenses or make any election of remedies which it has or may have, but expressly reserves such rights, claims, causes of action and defenses.

## IX.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Faulconer Productions Music Corporation, prays for judgment against Defendants as follows:

1.   That Defendants each be held to have infringed Faulconer's Copyrights and that Faulconer be awarded damages for Defendants' copyright infringement either: (i) actual damages in an amount to be determined at trial, together with Defendants profits derived from their unlawful infringement of Faulconer's Copyrights; or (ii) statutory damages for each act of infringement in an amount provided by law, as set forth in 17 U.S.C. § 504, at Faulconer's election before entry of a final judgment.

2.   That Defendants be enjoined from directly or indirectly infringing on Faulconer's Copyrights or continue to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copies from Faulconer's Copyrights or to participate or assist in any such activity.

3.   That Defendants be enjoined to return to Faulconer any originals, copies or duplicates of Faulconer's Copyrights in Defendants' possession, custody or control.

4.   That Defendants be enjoined to recall from all distributors, wholesalers, jobbers, dealers, retailers, non-Faulconer-licensed customers and distributors, and all others known to Defendants any originals, copies or duplicates of any works shown by the evidence to infringe any Faulconer Copyright.

5.   That Defendant each be required to account for and pay over to Faulconer

all gains, profits, and advantages derived from Defendants' acts of infringement.

6.     That all gains, profits, and advantages derived from Defendants' act of infringement and other violations of law be deemed to be in constructive trust for the benefit of Faulconer.

7.     That judgment be entered for Faulconer and against Defendants for fraud and for trebling of the damages awarded.

8.     That the 1999 Contract and 2000 Music Agreement entered into between Faulconer and Faulconer be rescinded.

9.     That, in the alternative, Faulconer be awarded actual, consequential, and exemplary damages as a consequence of Defendants' intentional, fraudulent, and tortious conduct surrounding the material breaches of the 1999 Contracts, 2000 Music Agreement, and Settlement Agreement.

10.     That Faulconer be awarded its attorney's fees incurred in the trial of this matter as well as all contingent interest for all possible appeals pursuant to a cause of action for attorneys fees herein.

11.     That Faulconer pre-judgment and post-judgment interest at the highest lawful rate be assessed on all sums awarded herein from the date of judgment until paid.

12.     That all costs of court be assessed against Defendants.

13.     That the court grant such other, further, and different relief as the court deems proper under the circumstances.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELEMAN & DICKER, LLP

Steven R. Shaver
State Bar No. 18136550
Deanna L. Stuemke
State Bar No. 24030778
5000 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone: (214) 698-8000
Facsimile: (214) 698-1101

GODWIN GRUBER, LLP
Rick Lane Lambert
State Bar No. 11844725
Todd B. Stoller
State Bar No. 24008092
Bryan C. Ng
State Bar No. 24027695
1201 Elm Street, Suite 1700
Dallas, Texas 75270

ATTORNEYS FOR PLAINTIFF
FAULCONER PRODUCTIONS
MUSIC CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of May, 2005, a true and correct copy of the foregoing document was served on Defendants' counsel via U.S. Certified Mail, Return Receipt Requested, as indicated below:

Larry L. Fowler, Jr.
Shannon, Gracey, Ratliff & Miller, L.L.P.
1000 Ballpark Way, Suite 205
Arlington, TX 76011-5168

Steven R. Shaver